615 S.E.2d 26 (2005)
In re D.J.D., D.M.D., S.J.D., J.M.D., Minor juveniles.
No. COA04-955.
Court of Appeals of North Carolina.
July 5, 2005.
Katharine Chester, Siler City, for respondent-appellant.
Theresa A. Boucher, Assistant County Attorney, for Forsyth County Department of Social Services, and Womble Carlyle Sandridge and Rice, by G. Wriston Marshburn, for the Guardian ad Litem.
*28 MARTIN, Chief Judge.
Respondent appeals the termination of his parental rights to D.J.D., D.M.D., S.J.D., and J.M.D. For the reasons stated below, we affirm the order of the trial court.
On or about 24 August 1999 the Forsyth County Department of Social Services (DSS) assumed non-secure custody when the children's mother started a fire after falling asleep with a pot of food cooking on the stove. DSS alleged neglect because of the family's involvement with DSS due to J.M.D.'s testing positive for cocaine at birth, the history of domestic violence between the parents, the mother's admission of drug addiction, the refusal to enroll one child in school, excessive absenteeism by another child, and the failure to maintain immunizations. At a hearing on 22 September 1999, the mother acknowledged the allegations, respondent "stood mute" and the children were adjudicated neglected pursuant to N.C. Gen.Stat. § 7B-101(15). Permanency planning review hearings were conducted on 17 December 1999, 17 March 2000, 12 July 2000, 13 September 2000, 14 March 2001, 14 September 2001, 15 March 2002, 14 June 2002, 13 September 2002, 13 December 2002 and 13 June 2003. On 1 May 2003 DSS filed a petition to terminate parental rights.
*29 It appears from the record before us that respondent was incarcerated at some time between the non-secure custody order and the 22 September 1999 adjudication. On 30 May 2000, he "was convicted of possession of cocaine and habitual felony" and sentenced to a minimum of 80 months in the custody of the Department of Corrections. The trial court acknowledged that due to his incarceration, respondent would be unable to comply with the DSS case plan pursuant to the 22 September 1999 order. At all of the review hearings, however, respondent was ordered to comply with substantially the same reunification requirements:
a) Address legal issues.
b) Obtain a drug assessment to determine his drug usage.
c) Attend Family Services  Men's Time Out Program for domestic violence issues and comply with recommendations[.]
d) Pay child support for each child beginning in January, 2000.
e) Attend supervised visitation with children according to DSS recommendations.
At the 17 December 1999 hearing DSS was relieved of reunification efforts.
During December of 1999 and January and February of 2000, respondent, apparently on bond awaiting trial, successfully attended supervised visitation, but did not pay child support, obtain a drug assessment, or attend the domestic violence program. At the 17 March 2000 hearing, placement with the maternal grandmother was the permanent plan. In addition to reiterating requirements similar to those recited above, the trial court ordered respondent to 1) pay $50.00 in child support by 1 April 2000; 2) not disrupt the children's placement, 3) receive birth control education, and 4) submit to drug testing at DSS's cost.
In its order following the 12 July 2000 hearing, the trial court found respondent had tested positive for cocaine on 17 March and suspended his child support obligations until he was eligible for work release. The permanent plan for the children continued to be placement with their maternal grandmother, but adoption was considered a concurrent plan. Similar findings were reiterated at the 13 September 2000 hearing, since respondent refused to attend the detention center's domestic violence program, failed to demonstrate appropriate parenting skills at subsequent visits with the children and had not completed any reunification requirements. The court determined that the children had been in foster care for over one year, and it approved the permanent plan to be adoption since "their mother, father, and maternal grandmother" were not suitable placements.
At the 14 March 2001 hearing, the court made additional findings concerning respondent's pending charges for driving without a license and speeding. It also noted that he was enrolled in a GED program and still had not attempted reunification requirements. The child support order was modified to be effective "at the point of his release or as he is eligible for work release." At the 14 September 2001 review, the only substantial change from the previous orders was that respondent should be allowed to 1) send his children mail through DSS and 2) conditioned upon the approval of the children's therapist, visit with them at the detention center.
At the 15 March 2002 hearing, the court found respondent "previously requested not to be writted [sic] in for future review hearings" and noted that respondent had institutional charges for active rioting, fighting and "creating offensive" at Caswell Correctional Center, and he still was not addressing the required issues. The permanent plan remained adoption, but since the mother was making progress regarding her requirements, the concurrent plan was reunification with her and DSS was ordered not to file a termination petition for six months. Respondent's child support obligations were "suspended retro-active July 14, 2000 until [respondent was] eligible for the Work Release Program" after the 14 June 2002 hearing.
Prior to the 13 December 2002 hearing the mother had a stroke, requiring care by the children's maternal grandmother, so, while adoption remained the permanent plan, the concurrent plan was changed to reunification with their mother and/or guardianship with relatives. At the 13 June 2003 hearing, the court noted that a termination petition had been filed on 1 May 2003 and the termination *30 hearing was scheduled for 21 July 2003; counsel and a Guardian ad Litem were appointed for respondent. This same order also scheduled another permanency planning review hearing for 12 December 2003 and the termination hearing for 15 September 2003.
Citing court conflicts, the case was continued until 10 September 2003. The 10 September 2003 order noted that the children's mother had suffered a stroke and had indicated through her attorney that she would "sign a Relinquishment of Minor for Adoption" form. Respondent, not present at the hearing but represented by counsel, indicated that he "intended to contest the Petition and wanted to be present for the hearing;" so the court granted his counsel's motion to continue. The court scheduled a hearing for 17 November 2003, and arranged for respondent's presence.
At the 17 November 2003 hearing, testimony by DSS tended to show that there was an existing pre-adoptive home for three of the four children, and a potential home for the fourth child; and that respondent visited with his children fifteen times between August 1999 and his 30 May 2000 conviction but had not communicated with them since. Respondent testified that he could not comply with all reunification requirements because he was not accepted into the DART program since he "was a drug dealer" not a "user." Other relevant findings by the trial court are:
(14) While respondent father has been in custody, he has had absolutely no contact with his children. He has not made any telephone calls, sent any cards, written any letters, nor arranged for any gifts. Furthermore, no one acting on his behalf (family member or friend) has contacted the Department of Social Services requesting a visit with or attempting to communicate with the minor children. The Court finds that no child support was paid but also finds that respondent father was not employed at the time.
(15) Although there was a prison program available to provide Christmas cards and gifts at no expense to a prisoner, the respondent father testified that he was advised that he could not participate without knowing the children's address. However, respondent father did have contact with his mother, sister, and the children's mother and never requested any one of those individuals (or any other family member or friend) to contact the Department of Social Services to check on the welfare of his children or even to ascertain an address where mail could be sent to the children. The Court finds that respondent mother had been in regular contact with the Department of Social Services and his sister, who lives in Forsyth County, as well as other relatives who live in Forsyth County, could also have made inquiries with the Forsyth County Department of Social Services on his behalf but none did so. When asked why he did not write to his children, his sworn testimony was that he "did not want the children to know that he was in prison."
. . . .
(17) Upon cross-examination, respondent father was unable to provide the date, month, year, or age of any of his four children.
. . . .
(19) ... The Court finds that respondent father has not provided the name of any suitable person who could provide for the children until the time of his release from prison, whether in calendar year 2005 or calendar year 2007.
(20) Although respondent is limited as to what he can do at this time to provide for his children while he is incarcerated, he has failed to provide any contact, love, or affection for his children.... Although he has some difficulties with reading and writing, that cannot excuse his lack of effort to communicate with his children, either directly or with the assistance of other family members or friends.
. . . .
(22). . . . The Court specifically finds that none of the children have any significantly strong relationship with their father and the Court finds that that can be reasonably... related to the lack of contact between father and children for which respondent father must assume responsibility. Clearly, there will be at least two more years which will delay any form of permanency *31 plan and, based upon the respondent father's present situation, he is incapable of caring for the children and the children are dependent juveniles within the meaning of N.C.G.S. § 7B-101. It is clear that there is a reasonable probability that such incapability will continue at least until such time as respondent father is released and for some period of time thereafter.
The trial court concluded grounds existed for termination pursuant to four subsections of N.C. Gen.Stat. § 7B-1111(a): i.e., respondent (1) "neglected the minor children ... and continues to neglect the minor children in that, he has failed to provide any contact, love or affection as the result of his total lack of communication with them;" (2) "is incapable of caring for them at this time", due to his incarceration, and an extended period of time in foster care would be required; (3) willfully abandoned the children for at least six consecutive months before the filing of the petition because, despite increased literacy skills, he took no "steps to even contact [DSS] to inquire as to the health, education or welfare of the children" and (4) "lacks the ability to establish a safe home for these children at this time." Respondent appeals from the order terminating his parental rights.
On appeal, respondent presents twelve of his sixteen assignments of error in four arguments. He has not presented arguments in support of the remaining assignments of error contained in the record on appeal, and they are deemed abandoned. N.C. R.App. P. 28(b)(6). Respondent argues that 1) the petition was not properly verified; 2) DSS failed to make reasonable efforts to reunify the children with their father; 3) the trial court erred in concluding that the children were dependent, neglected, willfully abandoned, and that respondent lacked the ability to establish a safe home; and 4) the trial court failed to hold a timely termination hearing.
Respondent's first argument is that the petition did not include verification, which divests the trial court of jurisdiction. In re Triscari Children, 109 N.C.App. 285, 288, 426 S.E.2d 435, 437 (1993). The initial petition included a verification page, which was erroneously left out of the record on appeal. This Court permitted petitioner to amend the record on 25 January 2005 to include the complete petition. Since the record before us contains the verification page, and an affidavit by the Deputy Clerk of Superior Court, Juvenile Division, for Forsyth County, attesting to the fact that the petitions in each juvenile file contained the required verification page, the defect of which respondent complains has been cured. See In re Baker, 158 N.C.App. 491, 492, 581 S.E.2d 144, 145 (2003) (amending record on appeal to include notice of appeal, thus granting this Court jurisdiction); In re Pierce, 146 N.C.App. 641, 643, 554 S.E.2d 25, 27 (2001), aff'd, 356 N.C. 68, 78 565 S.E.2d 81, 88 (2002) (same). This assignment of error is overruled.
In his second argument respondent asserts that DSS failed to make reasonable efforts to reunify him with his children. Relying on In re Harris, 87 N.C.App. 179, 360 S.E.2d 485 (1987), respondent contends that there is not a significant difference between "diligent efforts" and "reasonable efforts". The termination statute which applied in Harris required DSS to undertake "diligent efforts;" however, that statute was replaced by section 7B-1111(a)(2) which
deleted the "diligent efforts" requirement, indicating an intent by the legislature to eliminate the requirement that DSS provide services to a parent before a termination of parental rights can occur.... [A] determination that DSS made diligent efforts to provide services to a parent is no longer a condition precedent to terminating parental rights.
In re Frasher, 147 N.C.App. 513, 517, 555 S.E.2d 379, 382 (2001); see also In re J.W.J., T.L.J., D.M.J., 165 N.C.App. 696, 700, 599 S.E.2d 101, 103 (2004)(holding diligent efforts is no longer required). DSS may be ordered to end reunification efforts during a review hearing if the trial court makes written findings of fact that:
(1) Such [reunification] efforts clearly would be futile or would be inconsistent with the juvenile's health, safety, and need *32 for a safe, permanent home within a reasonable period of time;
In re H.W., 163 N.C.App. 438, 445, 594 S.E.2d 211, 215, disc. review denied, 358 N.C. 543, 599 S.E.2d 46 (2004) (quoting N.C. Gen.Stat. § 7B-507(b) (2003)).
The trial court relieved DSS of efforts to reunify as of 17 December 1999. After recounting DSS attempts to assist the mother, the trial court found that return of the children would be contrary to their best interests. Respondent had not worked with DSS regarding his children. Moreover, there was evidence over the course of eleven review hearings showing DSS efforts with the family. Additionally, respondent testified that he did not want his children to know he was in jail, even though the court gave permission for DSS to facilitate visits. Because the trial court made the requisite findings, supported by competent evidence, this assignment of error is overruled.
In his third argument, respondent maintains that there were insufficient findings to support the grounds cited by the trial court when terminating his parental rights. We disagree. There are two stages to a termination of parental rights proceeding: adjudication, governed by N.C. Gen.Stat. § 7B-1109, and disposition, governed by N.C. Gen.Stat. § 7B-1110. In re Brim, 139 N.C.App. 733, 741, 535 S.E.2d 367, 371 (2000). During the adjudication stage, petitioner has the burden of proof by clear, cogent, and convincing evidence that one or more of the statutory grounds set forth in section 7B-1111 exists. N.C. Gen.Stat. § 7B-1109(e)-(f) (2003). "A finding of any one of the grounds enumerated [in section 7B-1111], if supported by competent evidence, is sufficient to support a termination." In re J.L.K., 165 N.C.App. 311, 317, 598 S.E.2d 387, 391, disc. review denied, 359 N.C. 68, 604 S.E.2d 314 (2004). The standard of appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law. In re Huff, 140 N.C.App. 288, 291, 536 S.E.2d 838, 840 (2000), disc. review denied, 353 N.C. 374, 547 S.E.2d 9, 10 (2001).
After a trial court determines that grounds to terminate parental rights exist, "the court shall issue an order terminating the parental rights" unless termination is contrary to the children's best interests. N.C. Gen.Stat. § 7B-1110(a) (2003). Whether termination is in the best interests of the child is discretionary, and a court may decline to terminate parental rights only "where there is reasonable hope that the family unit within a reasonable period of time can reunite and provide for the emotional and physical welfare of the child." In re Blackburn, 142 N.C.App. 607, 613, 543 S.E.2d 906, 910 (2001).
Respondent contends there were insufficient findings, based on clear, cogent, and convincing evidence, of dependency, neglect, willful abandonment, or his inability to establish a safe home to support the trial court's conclusion that grounds for termination existed. A finding, supported by competent evidence, of any one of the grounds in section 7B-1111 is sufficient to support a termination. J.L.K., 165 N.C.App. at 317, 598 S.E.2d at 391.
Respondent asserts his children are not dependent because he attempted to suggest an alternate child care arrangement while he is incarcerated. We disagree. A dependant child is "in need of assistance or placement because the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or whose parent, guardian, or custodian is unable to provide for the care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen.Stat. § 7B-101(9) (2003). The evidence supports the conclusion that these children are dependent since their parents were neither able to care for them nor did they suggest appropriate alternate placements. Respondent contends that he did propose an alternate placement; i.e., his aunt, whom he brought to DSS's attention at the termination hearing, but with whom he acknowledged that he had not spoken in five years. There was no evidence she was willing or able to care for these children. Cf. In re M.R.D.C., 166 N.C.App. 693, 702, 603 S.E.2d 890, 896 (2004), disc. review denied, 359 N.C. 321, 611 S.E.2d 413 (2005) (reversal *33 of a permanency planning order where trial court failed to consider placement with paternal grandmother, despite her testimony at the hearing that she wanted and was able to care for the child). This assignment of error is overruled.
Respondent next contends there were insufficient findings to support the trial court's conclusion of neglect. A prior adjudication of neglect "is admissible in subsequent proceedings to terminate parental rights," and evidence of changed conditions "and the probability of a repetition of neglect" must be considered. In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984); In re Beasley, 147 N.C.App. 399, 405, 555 S.E.2d 643, 647 (2001). As always, the best interests of the children and parental fitness at the time of the termination hearing are the determinative factors. Ballard, 311 N.C. at 715, 319 S.E.2d at 232. Neglect is more than a parent's "failure to provide physical necessities" and can include the total failure to provide love, support, affection, and personal contact. In re Ore, 160 N.C.App. 586, 589, 586 S.E.2d 486, 488 (2003) (internal citation omitted).
Respondent maintains that since he was unable to visit with his children due to his incarceration, but had a prior good relationship, the trial court's findings that he failed to provide any contact, love or affection and that future neglect was probable, are not supported by sufficient evidence. He further argues that there were no findings regarding why he was not at home at the time the children were initially removed. These arguments are not persuasive.
First, respondent was present at the neglect adjudication and presented no evidence regarding the allegations, he simply "stood mute" when given an opportunity to explain his absence. Second, while we acknowledge that incarceration limited his ability to show affection, it is not an excuse for respondent's failure to show "interest in the children's welfare by whatever means available." Whittington v. Hendren (In re Hendren), 156 N.C.App. 364, 368, 576 S.E.2d 372, 376 (2003). A father's neglect of his child cannot be negated by incarceration alone. Id.; see also Blackburn, 142 N.C.App. at 612, 543 S.E.2d at 909 (affirming termination of parental rights where mother rehabilitated in prison, and wrote letters to her child and DSS, but also had disciplinary problems while incarcerated, and would be unable to care for the child); cf. In re Shermer, 156 N.C.App. 281, 287, 576 S.E.2d 403, 407 (2003) (father incarcerated while his children in care, failed to work parts of his case plan, but no clear, cogent and convincing evidence of neglect because he demonstrated a relationship with his children, by contacting DSS from prison, writing letters and telephoning).
There is no evidence here that respondent attempted to show interest in his children, despite having more than five years to take some action. The trial court found continued neglect, evidenced by his lack of contact over the five years the children were in foster care. Respondent cannot remember their birthdays, made no attempt to communicate with them or to comply with the plan he signed with DSS, despite other efforts at rehabilitation. He also did not attempt to communicate with DSS regarding their welfare nor did he attempt to contact them through family members, despite the fact that he testified that he wrote to his mother and girlfriend. The evidence supports the findings of a lack of a relationship between the children and their father, and the likelihood of future neglect. Therefore, it was not an abuse of discretion by the trial court to determine it was in the best interests of the children to terminate respondent's parental rights, and this argument is overruled.
Parental rights can also be terminated when "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition." N.C. Gen.Stat. § 7B-1111(a)(7) (2003). Willful abandonment has been found where "a parent withholds his presence, his love, his care, the opportunity to display filial affection, and [willfully] neglects to lend support and maintenance." In re McLemore, 139 N.C.App. 426, 429, 533 S.E.2d 508, 509 (2000) (quoting Pratt v. Bishop, 257 N.C. 486, 501, 126 S.E.2d 597, 608 (1962)). Despite incarceration, a parent failing to have any contact can be found to have willfully abandoned the child, In re Adoption *34 of Searle, 82 N.C.App. 273, 276, 346 S.E.2d 511, 514 (1986), and this Court has upheld termination based on willful abandonment despite some contact between the parent and the children. See, e.g. In re T.D.P., 164 N.C.App. 287, 291, 595 S.E.2d 735, 738 (2004), aff'd, 359 N.C. 405, 610 S.E.2d 199 (2005) (termination upheld despite parent's communication with social worker via phone and letter, requests for photographs, arranged to have Christmas gifts sent, and evidence that prior to incarceration was an active participant in child's life); In re Humphrey, 156 N.C.App. 533, 540, 577 S.E.2d 421, 427 (2003) (four cards over seven years, less than one visit a year, one birthday card and no financial support). As recited above, respondent has taken none of the steps to develop or maintain a relationship with his children. Accordingly, this assignment of error is overruled.
Respondent also contends the petitioner failed to prove that he was unable to establish a safe home. We disagree. A parent's rights can be terminated when the parental rights with respect to another child of the parent have been terminated involuntarily by a court of competent jurisdiction and the parent lacks the ability or willingness to establish a safe home. N.C. Gen.Stat. § 7B-1111(a)(9) (2003); In re V.L.B., 168 N.C.App. 679, ___, 608 S.E.2d 787, 791, disc. review denied, 359 N.C. 633, 614 S.E.2d 924 (2005) No. 188P05, 2005 WL 1422489 (May 4, 2005) (parents unable to establish a safe home due to unstable mental health history and domestic violence, in light of Michigan termination of rights to other children).
Respondent does not dispute that his rights to two other children have been terminated. This fact, combined with the clear, cogent and convincing evidence regarding his incarceration and his inability to suggest alternate arrangements for his children, supports the trial court's conclusion that respondent was unable to establish a safe home, and justifies the termination of his parental rights on this ground as well. This assignment of error is overruled.
In his final argument, respondent argues the termination hearing was not timely, and thus, we must vacate the order and dismiss the petition to terminate his parental rights. While we agree there was error in the scheduling of the termination hearing, we do not believe respondent was prejudiced thereby. This Court has previously held that despite an eighty-nine day delay in reducing the order to writing, "vacating the TPR order" was "not an appropriate remedy for the trial court's failure to enter the order within 30 days of the hearing" where "neglect and abandonment had been proven by clear, cogent and convincing evidence as the grounds upon which respondent's parental rights were being terminated." J.L.K., 165 N.C.App. at 316, 598 S.E.2d at 391; see also In re E.N.S., 164 N.C.App. 146, 153, 595 S.E.2d 167, 172, disc. review denied, 359 N.C. 189, 606 S.E.2d 903-04 (2004) (holding reversal simply because of order's untimely filing would only further delay a determination of custody and respondent could not demonstrate prejudice); In re Joseph Children, 122 N.C.App. 468, 471, 470 S.E.2d 539, 541 (1996) (statute was violated but respondent failed to show prejudice).
Recent cases finding that a violation of the statutory time requirements prejudices all parties involved are distinguishable from the case sub judice. In In re B.P., ___ N.C.App. ___, ___, 612 S.E.2d 328, 333 (2005), this Court held the respondent was prejudiced by a "six month delay between the hearing and entry of the order, [when] respondent was not provided the necessary information from which she could prepare for future proceedings." Likewise, a "delay in excess of six months to enter the adjudication and disposition order terminating" a respondent's parental rights was "highly prejudicial to all parties involved," because respondent could not appeal until "entry of the order." In re L.E.B., ___ N.C.App. ___, ___, 610 S.E.2d 424, 426 (2005).
This case is distinguishable both statutorily and factually. First, the procedure here is governed by a different statutory provision stating "[t]he hearing on the termination of parental rights ... shall be held ... no later than 90 days from the filing of the petition... unless the judge pursuant to subsection (d) of this section orders that it be held at a later time." N.C. Gen.Stat. § 7B-1109(a) *35 (2003). Continuances are permitted "for good cause shown ... for up to 90 days from the date of the initial petition" and those that "extend beyond 90 days after the initial petition shall be granted only in extraordinary circumstances when necessary for the proper administration of justice and the court shall issue a written order stating the grounds for granting the continuance." N.C. Gen.Stat. § 7B-1109(d) (2003). B.P. and L.E.B. concerned requirements that orders "be reduced to writing, signed, and entered no later than 30 days following the completion" of the hearing. B.P., ___ N.C.App. at ___, 612 S.E.2d at 332 (quoting N.C. Gen.Stat. § 7B-905(a)); L.E.B., ___ N.C.App. at ___, 610 S.E.2d at 426 (quoting N.C. Gen.Stat. § 7B-1109(e)).
There is a distinction between the failure of the trial court to reduce an order to writing, which effects the respondent's time to appeal, and a delay in scheduling a matter for hearing. In B.P. and L.E.B., the time that elapsed between the filing of the petition and the hearing delayed the respondents' ability to appeal. B.P., ___ N.C.App. at ___, 612 S.E.2d at 333; L.E.B., ___ N.C.App. at ___, 610 S.E.2d at 426. Here, the petition was filed on 1 May 2003; the permanency planning review hearing order, entered 25 June 2003, nunc pro tunc 13 June 2003, notes that the original termination hearing was scheduled for 21 July 2003, within the statutory requirements. The order also scheduled the termination hearing for 13 September 2003, ninety days from the date of the permanency planning review hearing, and forty-four days after the termination hearing should have been held.
While this was a technical error, we do not believe it rises to the egregious, prejudicial delay found to have existed in B.P. and L.E.B., where the trial court was required to reduce the order to writing within thirty days and took over six months. While the case was erroneously delayed, the court continued to review the case on the permanency planning schedule, during which time a guardian ad litem was appointed for respondent. At the 10 September 2003 scheduled hearing, respondent's motion for a further continuance was granted and the hearing was set for 17 November 2003. Since respondent moved for the continuance, adding sixty-eight days to the trial court's original error, he has failed to demonstrate prejudice.
Moreover, respondent had no relationship with his children for five years, unlike the mother in L.E.B., who had weekly visitation. Delays prejudice the children, who are denied permanency. As L.E.B. points out, the time requirements in the statutes are designed "to provide prompt resolution in such matters" and children in this "age group traditionally have faced difficulty finding adoptive homes, as many prospective parents seeking to adopt limit their search to infants or younger children." L.E.B., at ___, 610 S.E.2d at 427. A forty-four day delay is not so prejudicial to respondent to warrant reversal where there is ample evidence on multiple grounds to terminate respondent's rights.
We reiterate that the best interests of the children are the paramount concern, In re Montgomery, 311 N.C. 101, 109, 316 S.E.2d 246, 251 (1984), and they "are at issue here, not respondent's hopes for the future." Blackburn, 142 N.C.App. at 614, 543 S.E.2d at 911. The children involved in the present case have been in care for almost six years, are thirteen, twelve, nine and six years old, and there was sworn testimony that their foster parents want to adopt them. Moreover, they do not have a relationship with their father, in part because of his unwillingness to communicate with them. The trial court did not err in determining, based on this evidence and the other evidence supporting the grounds to terminate respondent's rights, that it was in the children's best interests to do so.
Affirmed.
Judges TYSON and LEVINSON concur.